Judge STUCKY delivered the opinion of the Court.
We granted review to determine whether the military judge erred in applying Military Rule of Evidence (M.R.E.) 412 to prevent Appellant from introducing evidence of the alleged victim’s first marital affair to show a motive to fabricate the accusation against Appellant.[1] We hold that the evidence was constitutionally required, that the military judge abused her discretion by refusing to admit the evidence, and that it was not harmless beyond a reasonable doubt.
I.
A.
In accordance with his pleas, Appellant was found guilty of conspiracy, destruction of military property, larceny of military proper *316 ty, larceny, and housebreaking in violation of Articles 81, 108, 121, and 130, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 908, 921, 930 (2006). Contrary to his pleas, Appellant was found guilty of rape and sodomy by force in violation of Articles 120, 125, UCMJ, 10 U.S.C. §§ 920, 925 (2006). This appeal is limited to the latter charges. Appellant was sentenced to a dishonorable discharge, twenty-five years of confinement, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The convening authority approved the sentence, and the United States Army Court of Criminal Appeals (CCA) affirmed. United States v. Ellerbrock, No. ARMY 20070925, 2010 CCA LEXIS 32, at *16, 2010 WL 3931488, at *5 (A.Ct.Crim.App. Mar. 26, 2010).
B.
On April 10, 2007, the victim, CL, was spending time with a family friend, Specialist (SPC) Jackson. CL’s husband had just deployed, and her husband had asked SPC Jackson to look after CL. At 8:30 p.m., CL put her child to bed, and at around 9:00, she began to drink and ultimately consumed about a third of a pint of gin, which is three to four shots. After SPC Jackson decided to go home, CL testified that she took 2.5 milligrams of Xanax[2] to help her sleep. She had also taken .75 milligrams of Effexor[3] earlier in the day.
Shortly thereafter, CL’s friend, Ms. Van-trease, called and said that she was coming over. She brought with her Mr. Page and Appellant; SPC Jackson also stayed. CL had met Appellant earlier in the year when Ms. Vantrease introduced them to one another.
After her friends arrived, CL drank two hard lemonades. As the CCA noted, there was conflicting testimony about whether CL had also snorted lines of Xanax, but, by 11:00 p.m., CL was “ ‘a little louder than usual, kind of stumbling, but other than that, fine ... maybe slightly intoxicated.’” Ellerbrock, 2010 CCA LEXIS 32, at *2-*3, 2010 WL 3931488, at *1.
Sometime after 11:00 p.m., SPC Jackson and Ms. Vantrease went to the shoppette. Mr. Page, Appellant, and CL remained in the house, but Mr. Page soon left to sit in his car and await the return of SPC Jackson and Ms. Vantrease. When Mr. Page left, he stated that CL did not look drunk, passed out, blacked out, or otherwise incapacitated. By contrast, Ms. Vantrease testified that, before she left for the shoppette, CL was passed out in the bathroom. SPC Jackson testified that, before he left with Ms. Vantrease, CL was either on the couch or the bathroom floor, but he could not remember which.
Approximately thirty minutes passed while Mr. Page sat in his car awaiting the return of SPC Jackson and Ms. Vantrease. When they returned, Ms. Vantrease went to find CL in the apartment, while SPC Jackson and Mr. Page stayed outside. In less than a minute, Ms. Vantrease returned and told Mr. Page and SPC Jackson that she had heard sexual noises coming from the bedroom. Mr. Page’s testimony contradicted Ms. Van-trease’s testimony on this point, as he claimed that she told them that CL was passed out in the bathroom when she went to cheek on her. When the three went inside, they heard sexual noises, which were described as the bed squeaking and people moaning.
Ms. Vantrease opened the bedroom door and turned on the lights, revealing Appellant having sex with CL. The testimony from the witnesses regarding CL’s mental awareness ranged from SPC Jackson’s testimony that he saw her flinch to Mr. Page’s testimony that he saw no movement from CL and believed she had no control over her mental or physical faculties. A toxicologist testified that CL likely “exhibited] anywhere from minimal effects of sedation ... to being pre-comatose,” all of which was dependent on numerous factors, few of which are discussed in the evidence.
*317 Someone told Appellant to get off CL. Appellant allegedly responded by telling the group to leave because he was “almost done.” The three witnesses left the room and the apartment. When CL finally spoke with SPC Jackson the next morning, she said that she remembered having sex with Appellant and said something to the effect of, “I can’t believe I did that” and “I fe[el] horrible.”
II.
At trial, Appellant moved under M.R.E. 412 to introduce testimony that CL had engaged in a prior extramarital affair to support his theory that CL had a motive to lie about the consensual nature of the sex with him, which was to protect her marriage. The military judge considered the following evidence in making her decision.
A.
At the time of the alleged rape, CL had been married to her husband for approximately three years, but they had known each other for five years before they married. Approximately six months into the marriage, CL was living with a female roommate in Jacksonville, Florida, while her husband was stationed at Fort Stewart. At some point, a man ended up living in the apartment with them. After a month of living with the man, CL had an affair with him that lasted for three months. After ending the affair out of guilt, she told her husband about it.
When CL’s husband learned of his wife’s affair, he kicked down the door of the former paramour. CL’s husband testified that although he had not told anyone what he would do if his wife had another affair, “a lot of people that know me know that I’m hot tempered.” Despite the fact of the first affair, CL testified that it tended to make their marriage stronger, and her husband testified that the marriage was “all good.” At the time of trial, they also had a two-year-old child.
B.
The military judge ruled that the proffered evidence was inadmissible under M.R.E. 412 and determined that it was marginally relevant to show that CL had a motive to lie. In particular, the military judge concluded that the evidence of the previous affair was stale because it had occurred two and one-half years earlier. She further determined that CL had no reason to believe that a second affair would have led to a divorce, because CL’s marriage was stronger after the first affair, and the couple now had a child. She stated that it was speculative to conclude that a second affair would have resulted in a divorce.
Furthermore, the military judge concluded that the probative value of the evidence did not outweigh its dangers to CL’s privacy interests. She also determined that under M.R.E. 403, the dangers of unfair prejudice — waste of time and confusion of the issues — substantially outweighed the probative value of this evidence. For these reasons, the military judge concluded that the evidence was not constitutionally required.
The CCA held that the military judge did not abuse her discretion in excluding the evidence. Ellerbrock, 2010 CCA LEXIS 32, at *9, 2010 WL 3931488, at *3. The CCA further held that even if the military judge erred, any error was harmless beyond a reasonable doubt, because defense counsel could and did argue that CL had a motive to fabricate about the consensual nature of the sex even without evidence of the prior affair. Id. at *15-*16, 2010 WL 3931488, at *5.
III.
A.
We review the military judge’s ruling on whether to exclude evidence pursuant to M.R.E. 412 for an abuse of discretion. United States v. Roberts, 69 M.J. 23, 26 (C.A.A.F.2010). Findings of fact are reviewed under a clearly erroneous standard and conclusions of law are reviewed de novo. Id.
B.
M.R.E. 412[4] states that evidence offered by the accused to prove the alleged *318 victim’s sexual predispositions, or that she engaged in other sexual behavior, is inadmissible except in limited contexts. M.R.E. 412(a)-(b). The rule “is intended to ‘shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to [sexual offense prosecutions].’” United States v. Gaddis, 70 M.J. 248, 252 (C.A.A.F.2011) (alteration in original) (quoting Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-35 (2008 ed.)). While there are three exceptions set out in the rule, we are concerned only with the third, which states that the evidence is admissible if “the exclusion of ... [it] would violate the constitutional rights of the accused.” M.R.E. 412(b)(1)(C).
The exception for constitutionally required evidence in M.R.E. 412(b)(1)(C) includes the accused’s Sixth Amendment right to confrontation. Banker, 60 M.J. at 216, 221 (citing Weinstein’s Federal Evidence § 412.03[4][a] (2d ed. 2003)). An accused has a constitutional right “to be confronted by the witnesses against him.” U.S. Const, amend. VI. That right necessarily includes the right to cross-examine those witnesses. Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (citing Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)). In particular, the right to cross-examination has traditionally included the right “ ‘to impeach, ie., discredit the witness.’ ” Olden v. Kentucky, 488 U.S. 227, 231, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (quoting Davis, 415 U.S. at 316, 94 S.Ct. 1105).
However, an accused is not simply allowed “ ‘cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.’” Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam)). Indeed, “‘trial judges retain wide latitude’ to limit reasonably a criminal defendant’s right to cross-examine a witness ‘based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness’ safety, or interrogation that is repetitive or only marginally relevant.’” Michigan v. Lucas, 500 U.S. 145, 149, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) (quoting Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431). But no eviden-tiary rule can deny an accused of a fair trial or all opportunities for effective cross-examination. See Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431.
Generally, evidence must be admitted within the ambit of M.R.E. 412(b)(1)(C) when the evidence is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice. See Gaddis, 70 M.J. at 255 (“[T]he best reading of the rule is that, as in its prior iteration, the probative value of the evidence must be balanced against and outweigh the ordinary countervailing interests reviewed in making a determination as to whether evidence is constitutionally required.”). Relevant evidence is any evidence that has “any tendency to make the existence of any fact ... more probable or less probable than it would be without the evidence.” M.R.E. 401. The evidence must also be material, which is a multi-factored test looking at “‘the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue.’” Banker, 60 M.J. at 222 (quoting United *319 States v. Colon-Angueira, 16 M.J. 20, 26 (C.M.A.1983)). Finally, if evidence is material and relevant, then it must be admitted when the accused can show that the evidence is more probative than the dangers of unfair prejudice. See M.R.E. 412(c)(3). Those dangers include concerns about “harassment, prejudice, confusion of the issues, the witness’ safety, or interrogation that is repetitive or only marginally relevant.” Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431.
IV.
In this case, the record indicated that CL did not want her marriage to end, which tends to show that she had a motive to fabricate about whether the sexual intercourse with Appellant was consensual, namely to protect her marriage. See United States v. Smith, 68 M.J. 445, 448-49 (C.A.A.F.2010) (recognizing that protecting an established relationship provides a motive to lie about the consensual nature of sexual encounters). The issue presented is whether Appellant was denied his rights under the constitutionally required exception in M.R.E. 412(c)(3), when the military judge prevented him from presenting a theory that a previous affair made it more likely that CL would have lied in this case.
It is a fair inference that a second consensual sexual event outside a marriage would be more damaging to a marriage than would a single event, assuming the evidence in the record supported that inference. The primary concern expressed by the dissents is that Appellant did not present sufficient evidence to make such an inference relevant and probative in this case. We disagree.
Although common sense is the guiding principle for Appellant’s theory for admitting evidence of CL’s prior affair, see 1 Kenneth S. Broun et al., McCormick on Evidence § 185 (6th ed. 2006) (stating that determinations of relevancy must be based on “personal experience, general knowledge, and understanding of human conduct and motivation”), the evidence in this case sufficiently supports Appellant’s theory. After her prior affair, CL admitted that she was afraid that her husband would divorce her. Her concerns would not abate after a potentially second illicit sexual encounter, especially in light of her husband’s reaction to her first affair— kicking down the former paramour’s door.
CL’s knowledge of her husband’s reaction to her first affair makes it more likely she would have lied than if she did not know these facts. Her husband underscored this point when the military judge asked, “Specialist [L], have you ever told anyone what you would do if your wife had had an affair?” He responded, “Not to my knowledge, ma’am, but a lot of people that know me know that I’m hot tempered.” A reasonable reading of the husband’s response is that his “hot tempered” reaction to the first affair was not an aberration, which is something that “a lot of people” knew, including CL. The military judge’s conclusion that CL had no additional motivation to lie about a potential second affair because her marriage was stronger after the first was erroneous because it ignored the evidence and oversimplified the situation.
Furthermore, the military judge was incorrect to conclude that this evidence was too stale to be relevant. Time does not affect all evidence equally. See United States v. Kane, 726 F.2d 344, 348 (7th Cir.1984) (recognizing that mere passage of time does not make evidence irrelevant, as it will also depend on the nature of the evidence and its relation to what is to be proven). If CL engaged in consensual sexual intercourse with Appellant, then her previous affair, which was only two and one-half years old at the time, might well have been a relevant consideration to her husband’s decision in whether to continue on with the marriage. In light of her husband’s reaction to the previous affair, one cannot discount that CL likely knew of the real danger a second affair might cause to her marriage.
Therefore, contrary to the military judge’s ruling, evidence of CL’s prior affair, including her husband’s reaction to it, has a direct and substantial link to CL’s credibility, a material fact at issue. See United States v. Stavely, 33 M.J. 92, 94 (C.M.A.1991) (noting that evidence directly probative of a witness’s truthfulness is always relevant to the issue of *320 credibility). Here, the existence of a prior affair may have established a greater motive for CL to lie about whether her sexual encounter with Appellant was consensual. Because the evidence has a tendency to prove or disprove a substantial issue in question, it is both relevant and material.
The final step in deciding whether evidence of CL’s first affair was required to be admitted is to balance the probative value of the evidence against the dangers of unfair prejudice. Gaddis, 70 M.J. at 256. Here, the probative value of this evidence is high. Since the other witnesses’ testimony was conflicting, the credibility of CL’s testimony about whether she consented was crucial to Appellant’s conviction. And, as discussed above, evidence of CL’s prior affair has a direct and substantial link to CL’s credibility; thus, this evidence is highly probative.
Furthermore, the military judge overstated the M.R.E. 403 concerns in this case. There is no dispute as to whether the affair occurred. As such, this evidence was unlikely to result in a waste of time or lead to a trial within a trial to determine whether past events actually occurred. Confusion of the issues was also unlikely, given that the theory of relevance was relatively straightforward. And with proper instructions from the military judge on how the members could use this evidence, there is little concern that the members would have been misled. See United States v. Walker, 42 M.J. 67, 74 (C.A.A.F.1995) (recognizing that the military judge’s instructions to members on the proper use of testimony could have resolved M.R.E. 403 issues).
Because evidence of CL’s prior affair was relevant, material, and the probative value of the evidence outweighed the dangers of unfair prejudice, the evidence of CL’s prior affair was constitutionally required in this case. The exclusion of CL’s prior affair constituted a constitutional error, which means we must test the error to see if it was harmless beyond a reasonable doubt — whether “ ‘there is a reasonable possibility that the evidence [or error] complained of might have contributed to the conviction.’” United States v. Moran, 65 M.J. 178, 187 (C.A.A.F.2007) (quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
V.
To determine whether an error affecting an accused’s right to cross-examination was harmless beyond a reasonable doubt, we apply the test developed in Van Arsdall, which states the following nonexclusive, five factors:
[T]he importance of the witness’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.
475 U.S. at 684, 106 S.Ct. 1431.
In this case, CL’s testimony was important to the Government’s case. Although three eyewitnesses saw CL and Appellant having sex, they did not provide a coherent picture of her mental capacity before, during, or after the alleged rape. This is problematic, since the sole issue in this case was whether CL consented. As such, CL’s testimony about consent was crucial to Appellant’s conviction. This factor weighs in favor of finding harm. Furthermore, absolutely no evidence of CL’s prior marital affair was admitted; therefore, cross-examination on this subject would not have been cumulative. This factor also weighs in favor of finding harm.
Although some evidence corroborated CL’s version of events, there were significant contradictions in the witnesses’ testimony. For instance, there was varying testimony about how much Xanax CL actually ingested or whether she snorted any. Ellerbrock, 2010 CCA LEXIS 32, at *2-*3, 2010 WL 3931488, at *1. There was conflicting testimony as to when and if CL passed out and vomited. Indeed, the toxicologist called by trial counsel summarized the degree of doubt over CL’s intoxication in testifying that she “exhibit[ed] anywhere from minimal effects of sedation ... to being precomatose.” Based *321 on the Government’s theory, the difference between CL’s being minimally sedated and precomatose may have been the difference between consensual sex and rape. This factor also leans in favor of finding harm.
Even though CL was subjected to substantial cross-examination, none of the questions were about her previous affair. As such, this factor also leans towards a finding of harm. See Roberts, 69 M.J. at 29 (recognizing that extensive cross-examination of the witness alone is not enough, if the cross-examination permitted did not include questions on the issue constitutionally required).
Finally, the prosecution’s case was not overwhelming. Even though the witnesses saw Appellant and CL having sex, they failed to provide a coherent picture of CL’s mental capacity before, during, or after the alleged rape. Because the only issue at trial was whether she could and did consent, her testimony on that issue became crucial to Appellant’s conviction. This factor also leans towards finding harm, especially since evidence of CL’s previous affair could have reasonably called into question the credibility of CL’s testimony.
Under the circumstances of this case, “ ‘[a] reasonable jury might have received a significantly different impression of [the witness’s] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination.’” Smith, 68 M.J. at 451 (alterations in original) (quoting United States v. Collier, 67 M.J. 347, 352 (C.A.A.F.2009)). As such, we are convinced that there is a “reasonable possibility that the evidence [or error] complained of might have contributed to the conviction.” United States v. Ashby, 68 M.J. 108, 122 (C.A.A.F.2009) (alteration in original) (citation and quotation marks omitted). Therefore, we find this error was not harmless beyond a reasonable doubt.
VI.
The judgment of the United States Army Court of Criminal Appeals is reversed as to the findings of guilty of rape and sodomy by force. Those findings and the sentence are set aside. The findings of guilty of the offenses to which Appellant pled guilty are affirmed. A rehearing may be ordered.

. We also granted review of the constitutionality of M.R.E. 412(c)(3), an issue this Court addressed in United States v. Gaddis, 70 M.J. 248 (C.A.A.F.2011).

. According to the toxicologist’s testimony, Xa-nax is prescribed for anxiety disorders. As the expert explained, Xanax affects on neurotransmitters in the brain to increase sedation.

. According to the toxicologist’s testimony, Effe-xor affects the neurotransmitters in the brain to combat anxiety and depression. Mild sedation is also a possible side effect.

. Appellant's trial was completed on August 15, 2007. Executive Order 13,447, which amended *318 M.R.E. 412(c)(3) to include the problematic language of "to the alleged victim’s privacy," was not released until September 28, 2007, more than a month after the trial. Exec. Order No. 13,447, 3 C.F.R. 243 (2008). The military judge, however, still conducted a balancing that relied heavily on the victim’s privacy interest, a position this Court appeared to adopt in United States v. Banker, 60 M.J. 216 (C.A.A.F.2004). See Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-36 (2008 ed.) (noting that the amended language in M.R.E. 412(c)(3) was meant to "highlight current practice” in military law, citing Banker as inspiration). Therefore, even though the military judge did not apply the current version of M.R.E. 412, she applied a balancing test consistent with how the rule is currently written. Therefore, the balancing conducted by the military judge in this case raises the same concerns as if the balance had been conducted in accordance with the 2007 amendment to the rule.